UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| INTEGRATED GLOBAL CONCEPTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>j2 GLOBAL, INC. and ADVANCED MESSAGING TECHNOLOGIES, INC.<br><br>Defendants. | Case No. C-12-03434-RMW<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Re Docket No. 120]<br><br>[Consolidated with Case No. C-13-02971 for trial of contract interpretation issue] |

Defendants j2 Global, Inc. ("j2") and Advanced Messaging Technologies, Inc. (collectively "defendants") move for summary judgment as to all counts of plaintiff Integrated Global Concepts, Inc.'s ("IGC") complaint in Case No. 12-3434 and counts IV and V of IGC's counterclaims in Case No. 13-2971. All counts relate to IGC's position that defendants breached a release and covenant not to sue in a June 2000 Agreement of Understanding ("Agreement") between the parties. The court finds that defendants have not breached the Agreement, and grants summary adjudication on the contractual interpretation issue.

# I. BACKGROUND

The Agreement of Understanding arose out of merger negotiations between eFax and j2.[1] eFax, j2, and IGC are all involved in facsimile technologies, including "fax-to-email" systems. A fax-to-email system allows a user to receive faxes sent to a phone number as an email attachment. At the time j2 and eFax began negotiating, j2 was not aware that eFax relied on IGC to provide support for eFax's fax-to-email systems. eFax and IGC had some preexisting disputes related to IGC's support, including payments that IGC believed it was entitled to from eFax. When j2 discovered these disputes, and discovered that eFax did not own the software used to carry out its services, all three companies entered into an Agreement of Understanding in order to resolve any eFax-IGC disputes prior to the merger and to arrange for IGC to continue supporting the eFax customers while they were migrated onto j2's platform. Dkt. No. 120-3, Johnson Decl. Ex. 1 (Agreement of Understanding).

Later, IGC offered fax-to-email services to other customers. j2, then the owner of several patents on fax technology, sued IGC for patent infringement. IGC alleges that j2 released its patent infringement claims in the Agreement of Understanding. A more detailed discussion of the facts follows.

### A. IGC Provides Support and Services to eFax

IGC is a Chicago-based business that began offering fax service to consumers around 1993. Dkt. No. 121-1, Johnson Decl. Ex. 4 (Decl. of John R. ["Jack"] Neurauter in support of Motion to Dismiss) at ¶ 2, 3. In September 1998, IGC was approached by JetFax, a former name of eFax,[2] to develop a fax-to-email service. *Id.* ¶ 4. IGC and eFax entered into two agreements, the Software Development Agreement and the Co-Location Agreement, to develop and run the fax-to-email service. *Id.* ¶ 8; *See also* Dkt. No. 121-3, Johnson Decl. Ex. 6 (Co-Location Agreement); Dkt. No. 121-4, Johnson Decl. Ex 7 (Software Development Agreement).

The Software Development Agreement provides that IGC will modify its own fax-to-email software and develop a custom interface for use with eFax's software and equipment in exchange

---

[1] Some of these prior events actually involved j2's predecessor, JFAX. The court refers to both companies as "j2."
[2] JetFax later changed its name to "eFax.com" or "eFax," and the court refers to the company as "eFax." Dkt. No. 121-1, Ex. 4 ¶ 7.

for payment from eFax. Dkt. No. 121-4 at 1. The Co-Location Agreement provides that IGC "shall host the eFax.com Products on eFax.com equipment located at IGC's site (the 'Co-Location Services')" in exchange for payment from eFax. Dkt. No. 121-3 at 7. Both agreements were signed on February 16, 1999 by Jack Neurauter, CEO of IGC, and Edward Prince, CEO of eFax.

### B. j2 and eFax Plan to Merge

In early 2000, eFax "was losing money" and began exploring a merger with j2. Dkt. No. 121-5, Johnson Decl. Ex. 8 (Kenck Depo.) at 59:17-21; Dkt. No. 121-7, Johnson Decl. Ex. 10 (Proxy Statement) at 75. At that time, both companies were offering fax-to-email services on a free and paid-subscription basis. Dkt. No. 122-1, Johnson Decl. Ex. 11 (j2 Board Notes June 9, 2000) at 2. The intent of the merger was for j2 to acquire eFax's customer base, and then work to convert eFax's free subscribers into paid subscribers. *Id.* When eFax and j2 were first discussing the possibility of a merger, j2 was unaware that IGC provided eFax with software or support. Proxy Statement at 77; j2 Board Notes June 9, 2000 at 1.

In the Spring of 2000, eFax informed IGC that it was discussing a merger with j2. Dkt. No. 120-5, Johnson Decl. Ex. 3 (Neurauter Depo.) at 47:15-21. IGC in turn informed eFax that IGC believed it had performed work beyond the scope of the parties' agreements, for which eFax was obligated to pay. *Id.* at 52:10-14, 23-25. Unsurprisingly, eFax did not agree that it owed IGC additional money. *Id.* at 54:3-5.

j2 also learned that IGC believed it owned the software used to run eFax's system, pursuant to the Software Development Agreement, and that eFax might not be able to continue running its system after the merger. j2 Board Notes June 9, 2000 at 1-2; Kenck Depo. at 45:8-20, 71:20-23. j2 understood that these outstanding issues would cause significant problems with the merger because j2 would need time to transition eFax's customers onto j2's systems, and would need IGC's assistance to carry out the transition. Dkt. No. 121-6, Johnson Decl. Ex. 9 (Hamerslag Depo.) at 37:12-38:7.

Between April and May 2000, IGC and eFax discussed (1) obtaining IGC's assistance in transitioning customers from the eFax system to j2's system; (2) eFax obtaining a license to the software that IGC developed for eFax; and (3) IGC "relinquishing any claim which it might have

against [eFax] for past services provided by [IGC] to [eFax]." Proxy Statement at 76. j2 informed eFax "that the merger agreement could not be executed until [eFax] reached an agreement with [IGC] on those issues." *Id.*

### C.  IGC, j2, and eFax Enter Into the Agreement of Understanding on June 30, 2000

In order to address the concerns mentioned above, all three companies entered into an Agreement of Understanding ("Agreement") on June 30, 2000. The Agreement was first set out in a Letter of Understanding sent from eFax to IGC on May 30, 2000. Dkt. No. 120-4, Johnson Decl. Ex. 2 (Letter). The Letter included a release covering "all past claims which they [i.e. IGC and eFax] may have against each other in connection with any oral or written agreements." *Id.*

The final Agreement provided that (1) j2 would deliver 2 million shares of j2 common stock to IGC; (2) IGC would grant j2 and eFax a non-exclusive license to its source code and related materials though the of the this "transition period"; (3) IGC would assist in transitioning eFax's customers to the j2 platform for additional consideration; and (4) the parties would release each other from any claims related to past services. *See* Agreement, Dkt. No. 120-3, §§ (5) and (6). The mutual releases are the focus of the dispute here. The court refers to Section 5 as the "Merger Party Claims waiver" and Section 6 as the "1542 waiver."

The Merger Party Claims waiver provides:

> Section 5(a): Release of Rights by [j2] and eFax.
>
> . . . [E]ach of [j2] and eFax effective as of the Closing Date, on behalf of itself and each of the Merger Parties, will release and fully discharge each of the IGC Parties, from any and all claims, demands and liabilities of whatever kind, whether presently known or unknown, suspected or alleged, and whether for damages or for equitable relief, including injunctive relief, corrective action, closure or remedial action, arising from or related to any past services, equipment software or other assets provided by IGC to the Merger Parties whether pursuant to the Development Agreement, the Co-Location Agreement or any other agreement or understanding, whether written or oral (the "Merger Party Claims").

The 1542 waiver provides:

> Section 6: Nature of Releases.
>
> . . . Each of IGC, eFax and [j2] waives all rights and benefits which it now has or in the future may have under and by virtue of the provisions of California Civil Code Section 1542, with the purpose and intent that the

> releases contained herein shall be construed as general and unqualified releases pursuant to the terms hereof. Each of IGC, eFax and [j2] understands and acknowledges that Sections 4 and 5 apply not only to all claims which are presently known, anticipated or disclosed, but also to those which are presently unknown, unanticipated or undisclosed. Each of IGC, eFax and [j2] acknowledges and agrees that the waivers set forth in Sections 4 and 5 are essential and material terms of this Agreement, without which the consideration relating hereto would not have been delivered.

On July 13, 2000, j2 and eFax finalized their Merger Agreement. *See* Proxy Statement. The transaction closed in November 2000. Dkt. No. 122-2, Johnson Decl. Ex. 12 (Morosoff Depo.) at 115:4-7. Pursuant to the Agreement, IGC assisted j2 in transitioning eFax's customers to j2. After the transition was completed, j2 and IGC ended their business relationship.

### D.  The j2 Patents

j2 has asserted infringement of five patents by IGC in the two cases before this court:

- U.S. Patent No. 6,208,638 (the '638 Patent), filed April 1, 1997, issued March 27, 2001, and reexamined December 9, 2008. The '638 Patent is asserted in counterclaims in Case No. 12-3434.

- U.S. Patent No. 6,350,066 (the '066 Patent), filed November 5, 1998, issued February 26, 2002, and reexamined May 5, 2009. The '066 Patent is asserted in counterclaims in Case No. 12-3434.

- U.S. Patent No. 6,597,688 (the '688 Patent), filed June 12, 1998, issued July 22, 2003, and reexamined March 11, 2008. The '688 Patent is asserted in counterclaims in Case No. 12-3434.

- U.S. Patent No. 7,020,132 (the '132 Patent), filed March 20, 2003, issued March 28, 2006. The '132 Patent is asserted in counterclaims in Case No. 12-3434.

- U.S. Patent No. 6,020,980 (the '980 Patent), filed September 30, 1996, issued February 1, 2000, and reexamined May 20, 2013. The '980 Patent is asserted in Case No. 13-2971.

In June 2000, j2 did not own any of the patents asserted. Only the '980 Patent had issued. j2 acquired the '980 Patent in 2012. j2 employees invented the inventions set out in the '638, '688, and '132 Patents and they were assigned to j2. j2 acquired the '066 Patent in 2004.

### E. Procedural History

The procedural history of this case began on April 20, 2012 when j2 filed a complaint for patent infringement against IGC in the Central District of California, asserting infringement of the '638, '688, '132 and '066 Patents. Case No. 12-cv-3439, Dkt. No. 1 ¶ 53. IGC, understanding that infringement suit to be a breach of the Agreement, filed a breach of contract claim in this court, because of the Agreement's venue clause. Agreement § 27.7 (providing that all disputes will be heard in the Northern District of California). After IGC filed its contract claim in this court on July 2, 2012, the Central District stayed j2's patent case pending resolution of IGC's contract claims here. In its answer to IGC's complaint, j2 filed counterclaims asserting infringement of the same patents alleged in the Central District case. Dkt. No. 43. The Central District then dismissed its case.

On June 27, 2013, j2 filed a complaint for patent infringement of the '980 Patent in this court. Case No. 13-2971. IGC counterclaimed for breach of contract, and the court consolidated the two cases for determination on the issue of contract interpretation.

j2 now moves for summary judgment on the contract claims. Dkt. No. 120.

During briefing on summary judgment, IGC was also pursuing a Motion to Compel before Magistrate Judge Grewal related to the deposition of Nicholas Morosoff, j2's former general counsel. *See* Dkt. No. 105. On the day before the summary judgment hearing, Judge Grewal granted-in-part the motion to compel and required j2 to produce Mr. Morosoff for a 30(b)(6) deposition related to the scope of the releases at issue here within 1 week. Dkt. No. 136.

## II. ANALYSIS

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and the "moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

IGC, opposing summary judgment, does not identify any material dispute of fact other than whether IGC's fax-to-email system has changed since the Agreement. Because the court does not reach that issue, *see infra* II.C, summary judgment is appropriate.

California law governs the interpretation of the Agreement. Agreement § 27.7. "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the

parties." *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 390 (2005). Generally, the parties' mutual intent is determined by objective manifestations such as (1) the words used in the agreement, (2) extrinsic evidence detailing the surrounding circumstances in which the parties negotiated the contract and (3) the subsequent conduct of the parties. *People v. Shelton*, 37 Cal. 4th 759, 767 (2006). If possible, a court should determine the mutual intent of the parties from the contract alone. *Powerine Oil Co.*, 37 Cal. 4th at 377. But California law requires a more "realistic approach" to contract interpretation and courts must seek to enforce the actual understanding of the parties to a contract. *Scott v. Pac. Gas & Elec.*, 11 Cal. 4th 454, 463 (1995). The court therefore must consider extrinsic evidence that is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pac. Gas & Elec. v. Thomas Drayage & Rigging Co., Inc.*, 69 Cal. 2d 33, 37 (1968).

California courts use a two-step process when considering extrinsic evidence to determine the meaning of a contract. *Wolf v. Super. Ct.*, 114 Cal. App. 4th 1343, 1351 (2004). "Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning." *Thomas Drayage & Rigging,* 69 Cal. 2d 33, 39-40. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992). The trial court's determination of whether an ambiguity exists is a question of law. The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict. *Wolf*, 114 Cal. App. 4th at 1351.

Here, the extrinsic evidence is not in dispute and, as a matter of law, supports only j2's interpretation of the agreement. j2 is therefore entitled to summary adjudication on the contractual interpretation issue.

### A. The Parties' Positions

#### 1. IGC's Interpretation

IGC argues that the Agreement releases all claims related to any services IGC was offering to j2 and eFax at the time of the merger. Because the IGC services accused of infringement are the same as IGC's 2000 services, j2 has already released IGC from liability for patent infringement. Therefore, j2 has breached the Agreement by suing IGC for patent infringement.

#### 2. Defendants' Interpretation

Defendants maintain that the merger release should be interpreted to release IGC from claims relating to past services provided by IGC to j2 and eFax only. Defendants are suing IGC for patent infringement related to services provided by IGC to others, which are not covered in the release. Defendants also argue that the IGC services have changed over time and are not the same services IGC offered at the time of the Agreement. Therefore, j2 has not breached the Agreement by suing IGC for patent infringement.

### B. The Language of the Contract, Extrinsic Evidence, and the Behavior of the Parties Subsequent to the Contract Support Defendants' Interpretation

The primary evidence of the parties' intent is the language of the Agreement itself. The two release provisions at issue are Section 5, the Merger Party Claims waiver, and Section 6, the 1542 Waiver. The court agreed at the Motion to Dismiss stage that the Agreement might be susceptible to more than one interpretation. Dkt. No. 41 (Order on Motion to Dismiss). The court therefore received extrinsic evidence to determine whether that evidence supported more than one reasonable interpretation of the contract. *Thomas Drayage & Rigging*, 69 Cal. 2d 33, 39-40. Having reviewed the extrinsic evidence, the court concludes that j2's interpretation of the contract language is correct.

#### 1. Language of the Contract

##### a. The Merger Party Claims waiver

The Merger Party Claims waiver applies to claims "arising from or *related to* any *past* services, equipment, software or other assets provided by IGC *to the Merger Parties*." Agreement § 5(a) (emphasis added). j2 argues that the waiver is limited to *past* claims for services provided *to* j2 or eFax. j2 is now suing IGC for current services provided to customers other than j2 or eFax. IGC argues that the infringement claims are *related to* those past services and are therefore released.

IGC's argument that the current infringement claims are "related to" past services it performed for j2 and eFax is somewhat strained. IGC is not being sued for providing software development, support, or transition services to another company, but for providing its own stand alone fax-to-email service to other customers. It is clear from the language of the agreement and the parties' positions at the time of the Agreement that j2's intent was to eliminate all claims relating to eFax's prior relationship with IGC and secure IGC's help in transitioning customers to the j2 database. IGC in turn wanted to secure payment from eFax for the services it had already performed, was interested in continuing to receive payments from the eFax arrangement until the transition to j2 was complete, and wished to retain all of its intellectual property and equipment used to perform the eFax services. Thus, the Agreement is limited to claims arising out of the "past services, equipment, software or other assets provided by IGC to the Merger Parties." Agreement § 5(a).

IGC relies on *Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367 (Fed. Cir. 1999) to support its position that the alleged infringement is "related to" the released Merger Party Claims. In *Augustine* the parties settled an earlier unfair competition lawsuit related to convective warming blankets, and Augustine released Progressive from all actions

> that [Augustine] and/or its owners . . . have, have had, or may have against [Progressive] upon or by reason of or relating to any acts, omissions or statements made by [Progressive] on or before the date of this Settlement Agreement.

*Id.* at 1369. At the time of the agreement, all five Augustine patents were issued and Progressive was selling substantially the same convective warming blanket accused of infringement in the later suit. About six months later, Augustine sued Progressive for patent infringement on acts of infringement occurring after the date of the Settlement Agreement. *Id.* at 1370. The Federal Circuit found that Augustine had released its infringement claims because the agreement encompassed future claims that were "related to any actions taken by Progressive on or before the date of the Settlement Agreement." *Id.* at 1371. Because Progressive was already selling the blankets, its conduct was "related to" the Settlement Agreement and Augustine's claims were released.

1         The court does not find *Augustine* controlling on this case. The language of the release in *Augustine* is different from the language at issue here. The Federal Circuit's analysis is necessarily tied to the language it was interpreting. The court emphasized the phrasing "claims Augustine *may have* against Progressive" in determining that the *Augustine* Settlement Agreement was forward-looking. *Id.* The patent infringement claims were also fully ripe and had been discussed by the parties while negotiating the Settlement Agreement. *Id.* at 1369. Here, the release is limited to claims based on IGC's "past" actions.  Agreement § 5(a). There is nothing in the express terms of the Agreement releasing claims based upon future infringement actions by IGC.

For similar reasons *Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006) is also not controlling. *Marder* involved a release relating to the movie *Flashdance*, which was allegedly based on plaintiff's life story. *Id.* at 447. In *Marder*, plaintiff signed a release which "releases and discharges Paramount Pictures Corporation . . . of and from each and every claim, demand, debt, liability, cost and expense of any kind or character which have arisen or are based in whole or in part on any matters occurring at any time prior to the date of this Release." The Release also stated that "[w]ithout limiting the generality of the foregoing Release," Marder also releases Paramount from claims "arising out of or in any way connected with, either directly or indirectly, any and all arrangements . . . in connection with the preparation of screenplay material and the production, filming and exploitation of . . . Flashdance." *Id.* at 449. The language and scope of the release in *Marder* is significantly broader than the Merger Party Claim release at issue here. *Id.* (describing the language in *Marder* as "exceptionally broad"). The *Marder* release applied to all claims "in any way connected with, either directly or indirectly" writing, producing, filming, or marketing the movie.

Here, the release is limited to disputes over *past services provided to the merger parties*. j2's interpretation is the only interpretation consistent with the all of the language in the Merger Party Claims waiver and also consistent with the 1542 Waiver and extrinsic evidence, discussed below. IGC would have the court either ignore specific limiting terms placed in the release, or add broader language, like that contained in *Augustine* and *Marder*, into the contract. *Jensen v. Traders & General Ins. Co.*, 52 Cal. 2d 786, 790 (1959). Doing so would violate the court's obligation to simply ascertain and declare what in terms or in substance is contained in the contract.

b.  The 1542 Waiver

IGC's primary argument is that the 1542 waiver encompasses the infringement claims. Section 1542 of the California Civil Code provides that a general release does not cover claims that are unknown at the time the contract is executed. Because the parties waived Section 1542, their releases do apply to claims that were unknown at the time of the Agreement.

IGC does not address the limitation on the 1542 waiver: the "the releases of the IGC Claims and the Merger Party Claims," defined in Sections 4 and 5, "shall be construed as general and unqualified releases *pursuant to the terms hereof*." Agreement § 6 (emphasis added). A 1542 waiver may be limited to specific claims or circumstances. *See, e.g. Butler v. The Vons Companies, Inc.*, 140 Cal. App. 4th 943 (2006) (finding that contract was ambiguous as to whether employee only released union labor grievance claims, and not employment discrimination claims, so that Section 1542 waiver may not apply to discrimination claim); *Asare v. Hartford Fire Ins. Co.*, 1 Cal. App. 4th 856 (1991) (release did not apply to specific claim).

IGC seems to read the releases backwards in its argument that specific claims must be carved out from a general release if they are to be preserved.  IGC suggests that the Section 5 waivers are the limits on the general release in Section 6. This is not the case. The text of the 1542 waiver is carefully tied to the releases defined in Sections 4 and 5.[3] *See* Agreement § 6 (discussing the releases of "the Merger Party Claims," a term defined in § 5(a); excluding claims for beach of the Agreement from waiver; waiving Section 1542 "with the purpose and intent that *the releases contained herein*" will be general and unqualified; acknowledging that "Sections 4 and 5 apply not only to all claims which are presently known . . ."; acknowledging that "Sections 4 and 5 are essential and material terms . . . ."). Section 6, the 1542 Waiver, explains the "nature of the releases" contained in Sections 4 and 5. Because of this, j2 was not required to call out its patent infringement claims as preserved because nothing in the Section 5 release touches on those claims.

Reading the complete text of the releases together, the parties executed a general release of the Merger Party Claims (and other limited claims unrelated to the issues here). The release does not encompass every possible claim j2 might ever have against IGC or vice versa. j2's patent

---

[3] The releases in Section 4 are not at issue here.

SUMMARY JUDGMENT ORDER
Case Nos. C-13-02971; C-12-03434 -RMW LRM

- 11 -

infringement claims are not Merger Party Claims. Therefore, the 1542 waiver does not apply to the patent claims at issue in the current case. The court cannot read out of the 1542 waiver the phrase "pursuant to the terms hereof."

### 2. Extrinsic evidence Detailing the Surrounding Circumstances in which the Parties Negotiated the Contract

At the time of the Agreement, the parties "desire[d] to fully and completely settle all issues and outstanding claims between eFax and IGC prior to the Merger." Agreement at 1. The extrinsic evidence shows that the parties agreed to release claims arising from issues that arose prior to the merger of j2 and eFax relating to services that IGC provided to eFax, and services IGC would provide in the future to the merged j2-eFax. The extrinsic evidence does not support IGC's position that the parties agreed to release all potential claims between them, indefinitely.

j2 first points to the Letter of Understanding dated May 30, 2000 from eFax to IGC. Dkt. No. 120-4, Johnson Decl. Ex. 2 (Letter). The Letter confirms the parties "mutual understanding" of the terms to be entered in the Agreement. The Letter describes the services IGC will provide to eFax and j2 and the payment IGC will receive. The Letter also includes a release of "all past claims which [IGC and eFax] may have against each other in connection with oral or written agreements." *Id.* ¶ 5. The Letter clearly expresses the parties' intent to resolve all claims relating to IGC's provision of services to eFax and eFax's payment to IGC for those services. j2 is included in the Agreement because it wanted to ensure that eFax had no outstanding liabilities at the time of the merger and to secure IGC's assistance with transitioning eFax's customers. Dkt. No. 106-8, Heiser Decl. Ex. 7 (Morosoff Depo.) at 70:21 - 71:5.

IGC did not present any extrinsic evidence that the parties agreed to address any additional issues, such as future patent infringement claims relating to services IGC provides to third parties. IGC suggests that it would not have accepted a deal where IGC would be free from suit only for the period of the transition services. This argument misses the point. The Agreement is not limited by *when* the parties can sue. For example, IGC can never sue j2 alleging that eFax failed to pay for IGC's services. The Agreement is limited by *what* the parties can sue for.

IGC's argument appears to be that it would not have entered into an agreement if it knew it would be subject to j2's patent infringement suit later on. This position was not expressed during the parties' negotiations, and is not found in the language of the contract. The strongest evidence that IGC cites to support this position is testimony from Jack Neurauter stating his belief that any patent issues were waived because "[t]hat's in the agreement." Dkt. No. 106-5, Heiser Decl. Ex. 4 (Jack Neurauter Depo.) at 109:24. He then states that he did not discuss that "term of the agreement" with anyone at j2 or eFax, and agrees that the term does not expressly reference patents. *Id.* at 109:25-110:5. A party's unexpressed intention regarding the interpretation of a contract term is not enforceable under California law. *See e.g.*, *Winet*, 4 Cal. 4th at 1167; *Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 55 (1997) ("The true intent of a contracting party is irrelevant if it remained unexpressed.").

The court agrees with j2 that the extrinsic evidence shows that the parties wished to deal with any possible claims between IGC and eFax (later merging into j2) related to IGC's previous support of eFax and IGC's upcoming obligations to transition eFax's customers from the IGC system to the j2 system. These circumstances are consistent with the past-looking nature of the releases, limited to claims "arising from or related to any past services, equipment, software or other assets provided by IGC to the Merger Parties."

### 3. Behavior of the Parties Subsequent to the Contract

The subsequent behavior of the parties can also be used as evidence of the parties' intent. *Wolf*, 114 Cal. App. 4th at 1355; *Shelton*, 37 Cal. 4th at 767.

j2 directs the court to a 2002 licensing offer from EKMS, a licensing agent retained by j2, to IGC. *See* Dkt. No. 122-7, Johnson Decl. Ex. 17 (EKMS letter). On March 5, 2002, EKMS sent IGC a letter offering a non-exclusive license to the '638 patent and to U.S. Pat. No. 6,073,165. Mr. Neurauter, CEO of IGC, forwarded the letter to other IGC employees saying "Let the Games Begin." Dkt. No. 122-7. IGC later responded directly to j2 about the EKMS letter by denying infringement of the patents and indicating it believed the patents were invalid. Dkt. No. 122-8, Johnson Decl. Ex. 18; Dkt. No. 122-9, Johnson Decl. Ex. 19. IGC's letters also extensively addressed an issue related to the transition of eFax customers from the IGC system to j2's system.

1  *Id.* IGC never suggested that the Agreement gave it a license to the patents or excused its
2  infringement.
3        j2's position is that Mr. Neurauter's lack of surprise that j2 would sue IGC for patent
4  infringement is inconsistent with IGC's belief that it already had a release for the patents. IGC
5  argues its response to the 2002 license offer should be given little weight and the court should not
6  infer anything from the absence of a reference to the Agreement or release.
7        The court finds that IGC's response to the licensing offer is consistent with j2's
8  interpretation of the contract. It is clear from the letters that IGC was aware of the Agreement when
9  it was responding to j2 about the EKMS letter. But, IGC is correct that the letter cannot conclusively
10 show that IGC believed it did not have a license to the patents; invalidity or noninfringement are
11 sufficient defenses to a claim of patent infringement. Therefore, the licensing offer and response are
12 of limited weight in determining the intent of the parties. However, IGC presented no evidence
13 about the subsequent conduct of the parties that supports its own interpretation.
14       Although the court relies primarily on the language of the contract in granting summary
15 judgment to defendants, the extrinsic evidence also supports j2's interpretation.

### C. Effect of Any Changes in the IGC Fax-to-Email System

17 Because the court finds that the contract does not release infringement claims based on
18 IGC's services provided to other parties, the court does not need to decide whether IGC's fax-to-
19 email system has changed since the agreement was reached. Therefore, the court expresses no
20 opinion on whether the system has changed or what effect such changes would have on the release
21 provision.

### D. Deposition of Mr. Morosoff

23 IGC's position at the summary judgment hearing was that ruling on the summary judgment
24 motion would be premature at this time because on March 20, 2014 Magistrate Judge Grewal
25 ordered further deposition questioning of Mr. Morosoff, j2's 30(b)(6) witness. Although IGC should
26 have filed a Rule 56(d) request in connection with its opposition to the summary judgment motion,
27 the court will require compliance with Judge Grewal's order subject to a short extension of the
28 deadline for compliance. j2 must make Mr. Morosoff available for an additional four hours of

1   testimony by April 4, 2014. Based on that deposition, IGC may file a brief by April 11, 2014 not to
2   exceed five pages in length supported by testimony from Mr. Morosoff that justifies reconsideration
3   of the current order granting summary judgment. j2 may respond by April 18, 2014. Should the
4   court find that on reconsideration summary judgment should not have been granted, the trial date for
5   the contract interpretation phase will be reset for the earliest reasonable date.

### III.  ORDER

For the reasons explained above the court GRANTS j2's motion for summary adjudication on IGC's claims in Case No. 12-3434 and IGC's counterclaims IV and V in Case No. 13-2971 that j2's patent infringement claims have not been released.

Dated: March 21, 2014

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge